Ishan Dave, Esq.
**DEREK SMITH LAW GROUP, PLLC**
177 Park Avenue, Suite 200
San Jose, California, 95113
Phone: (212) 587-0760
Fax: (212) 587-4169
ishan@dereksmithlaw.com

Alexander G. Cabeceiras, Esq.
**DEREK SMITH LAW GROUP, PLLC**
One Penn Plaza, Suite 4905
New York, New York 10119
Phone: (212) 587-0760
Fax: (212) 587-4169
alexc@dereksmithlaw.com
APPERANCE *PRO HACE VICE*

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

-----------------------------------------------------------X

| | |
|---|---|
| AIRTON AMORIM DE ALMEIDA, | Case No.: 20-cv-04735 |
| Plaintiff | |
| -against- | |
| | **COMPLAINT** |
| WESTERN DIGITAL CORPORATION, WESTERN DIGITAL DO BRASIL COMERCIO E DISTRIBUICAO DE PRODUTOS DE INFORMATICA LTDA. | Plaintiff Demands a Trial by Jury |
| Defendants. | |

-----------------------------------------------------------X

Plaintiff AIRTON AMORIM DE ALMEIDA by his attorneys, DEREK SMITH LAW

GROUP, PLLC, hereby complains of Defendants WESTERN DIGITAL CORPORATION,

WESTERN DIGITAL DO BRASIL COMERCIO E DISTRIBUICAO DE PRODUTOS DE

1
**COMPLAINT**
Case No.: 20-cv-04735

INFORMATICA LTDA, upon information and belief as follows:

## JURISDICTION & VENUE

1. Jurisdiction of this action is conferred upon this Court as this case involves a Federal Question under 15 U.S.C. § 78u-6, *et al*.

2. 28 U.S.C. §1331 states that "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

3. Venue is proper in the Northern District of California under 28 U.S.C § 1391 (b) because events or omissions which gave rise to the claims fall within this Court's jurisdiction.

## PARTIES

4. At all times material, Plaintiff AIRTON AMORIM DE ALMEIDA ("PLAINTIFF" or "ALMEIDA") was and is an individual male who is a citizen of the country of Brazil.

5. At all times material, Defendant WESTERN DIGITAL CORPORATION ("WDC") was and is a domestic corporation duly existing by the virtue and laws of the State of California, with its principal place of business and headquarters located in San Jose, California.

6. At all times material WDC is a publicly traded company, subject to rules and regulations promulgated by the United States Securities & Exchange Commission.

7. At all times material, Defendant WESTERN DIGITAL DO BRASIL COMERCIO E DISTRIBUICAO DE PRODUTOS DE INFORMATICA LTDA ("WD Brazil") was and is a foreign corporation duly existing by the virtue and laws of the country of Brazil.

8. At all times material, the above corporate entities were joint employers of ALMEIDA.

9. At all times material WD Brazil was and is fully owned and operated by WDC.

## STATEMENT OF FACT

10. On or about February 13, 2012, Plaintiff was hired as Defendants' Latin America Finance Director.

*Protected Activity*

11. In or around early 2012, Plaintiff was concerned that Digitron, Defendants' Manufacturing Contractor in Brazil for assembling and selling Defendants' Hard Disk Drives, was defrauding and/or bribing the Brazilian tax authority to overlook misrepresented numbers.

12. Plaintiff believed Defendants' were complicit in Digitron's activity and, therefore, were susceptible to penalties.

13. At all times material, Plaintiff made multiple internal complaints relating to his concerns. This included, but was not limited to, directly complaining to Defendants' VP, Controller and Chief Accounting Officer, Joseph Carrillo. Carrillo, despite having knowledge of Plaintiff's concerns, took no reasonable or immediate action to help rectify or investigate the alleged defrauding.

14. On or about June 6, 2016, Plaintiff sent to Defendants' directors, senior executives, and outside auditors an e-mail subject "Digitron Audit Requested – Strong Suspicion of Fraud & Possible Bribery."

15. Plaintiff sent this e-mail through a pseudonym e-mail address to ensure anonymity. The e-mail address was "westerndigital.fcpa@gmail.com." Plaintiff stated, among other things, to Defendants:

*"WD Brazil has a sales office in Brazil and has a sales team to sell and represent WD for its customers. WD's goods are manufactured and sold by Digitron on behalf of WD. Western Digital Technology Inc. (U.S.) has contracts with Digitron to provide manufacturing services under the license of WD and to provide R&D services for compliance on the PPB, which is the basic production process. The contract relating to R&D and the PPB production process is for obtaining tax incentives for WD's business. R&D is one of the key legal requirements for obtaining the tax incentive package provided under the PPB by the Brazilian authorities.*

*The issues I am raising in this notification are very serious for WD because if Digitron is found to be non-compliant for the PPB tax program, then WD's potential exposure to the Brazilian government and OEMs could be massive. By way of example, WD´s OEM customers might be liable for USD $1.9 billion in taxes that they did not pay over the last five years. This USD $1.9 billion is the sales taxes related to the volume of PCs (Notebooks, Desktops) manufactured by the PC makers using WD hard disk drives (HDDs), drives that are manufactured locally under the PPB program. Specifically, the USD $1.9 billion figure relates to the taxes incentives – the exempted or forgiven taxes – granted by the Brazilian government to the PC makers (OEMs) in Brazil in reliance on Digitron being compliant.*"

"*It also should be noted that about USD $160 million in forgiven or exempted taxes were not paid by Digitron, as Digitron was provided incentives by the Brazilian government. If this is rescinded by the Brazilian government, Digitron could face an additional $205 million in penalties and interest, resulting in $365 million in exposure. Digitron almost certainly could not pay this so the Brazilian government would look to WD to cover this amount. Digitron is technically the seller of the WD drives to WD's customers in Brazil. Digitron has a manufacturing agreement with WDT so the Brazilian government could claim the unpaid taxes from WD as well. It should be emphasized that the tax incentives – which are forgiven or exempted taxes made possible via the PPB program – become profit to WD and directly benefit the WD business. Digitron does not make its profit from the sales of WD drives. Digitron makes its profit by charging WD for the manufacturing services per unit produced, which is something around $4 to $5 per unit, regardless of whether the drive is sold or not. In short, the primary beneficiary – if not the only beneficiary – of the tax incentives granted by the Brazilian government through the PPB program is WD and is yet another reason WD bears massive exposure from any noncompliance by Digitron.*"

"*The issue relates to the transfer pricing connected to the components supplied by WD Asia (Malaysia and Thailand) to Digitron. WD has setup a business model with Digitron where Digitron act as the manufacturing and the seller for invoicing and collecting the receivables from WD's customers in Brazil. As a result, WD is able to get the profit back to WD Asia by overcharging the components sold through Digitron. Once o month WD makes the A/R and A/P reconcilíatíon with Digitron in order to calculate and transfer the profít to WD , Asia. Considering the magnitude of the profits generated in the Brazil, operation, the cost adders buried in the cost of the components have made the cost of components very high. WD and Digitron are aware of, the potential tax exposure and are apparently taking their chances of not getting caught.*"

16. On or about June 16, 2016, Plaintiff submitted a Tip, Complaint, or Referral ("TCR") to the United States Securities and Exchange Commission ("SEC").

17. Additionally, Plaintiff shared his TCR with the Department of Justice's Foreign Corrupt Practices Act Unit.

18. By his actions, Plaintiff qualifies as a whistleblower pursuant to 15 U.S.C. § 78u-6(a)(6).

19. In or around July of 2016, Defendants launched an investigation into Plaintiff's claim. Plaintiff answered all questions through his anonymous e-mail. Plaintiff led all of Defendants' investigators to relevant evidence and witnesses.

20. At all times material, the investigation was handled by Defendants' United States offices, by United States citizens, based in California.

21. In or around October of 2016, the SEC notified Defendants that a TCR had been filed against them and that the SEC was launching an investigation into Defendants' dealings with Digitron, among other things.

22. On or about October 2, 2016, Plaintiff learned that Defendants would conduct their own internal audit of Digitron. Plaintiff believed an internal audit was inadequate, as Defendants had a financial incentive to cover up any fraud and avoid monetary penalties.

23. On or about October 14, 2016, Plaintiff supplemented his previously submitted TCR with new information, outlining Defendants' lackluster response to Plaintiff's concerns.

24. In or around November of 2016, Defendants sent representatives to Brazil to interview Plaintiff and 3 other individual employees in relation to Plaintiff's whistleblower complaint and the pending SEC investigation.

25. The 3 individual employees Defendants chose to interview other than Plaintiff had no knowledge of Defendants' dealings with Digitron or the alleged fraud. Defendants interviewed these 3 individuals for no more than 20 minutes each.

26. Upon information and belief, Defendants interviewed these employees simply for show. At that time, in or around November of 2016, Defendants had around 15 employees working out of Brazil. Out of all of those employees, Plaintiff was the only employee with the exposure and knowledge to submit the facts outlined in the anonymous e-mail.

27. At the same time, Defendants interviewed Plaintiff for over three hours.

28. Defendants focused all their attention on Plaintiff's knowledge relating to Digitron.

29. At all times material, Defendants had actual and/or constructive knowledge that Plaintiff was the whistleblower.

*Phishing Scam*

30. On or about September 27, 2017, Plaintiff received an e-mail from "mark-long@wdc-us.com."

31. At all times material, Defendants' Chief Financial Officer – Vice President of Finance was an individual named Mark Long.

32. On or about September 27, 2017, the alleged Mark Long made an urgent request for payment to a third-party supplier in Turkey and attached an invoice. Specifically, the alleged Mark Long stated:

   *"Please see below and find attached the due invoice for payment which should be processed as a priority payment so funds can be received tomorrow at the latest. The express transfer charges should be paid by the vendor.*
   *Please proceed with the payment and do furnish me with a bank payment confirmation as soon as you have it. I'm reachable via email all day."*

33. As instructed by the alleged Mark Long, Plaintiff orchestrated the payment to the third party. At that time, Plaintiff made Defendants' supervisors aware of the requested payment. At all times material, Plaintiff's supervisor Graham Holmes was copied on all requested payments and related correspondences.

34. At that time, Plaintiff requested the alleged Mark Long provide the appropriate documentation for such a transfer of a payment abroad—as is required by Brazilian law and regulations—to file with the Central Bank of Brazil.

35. At that time, Defendants' third-party accounting firm, Grant Thornton, who oversees these types of transfers, made an exception for Defendants providing the necessary documentation. Additionally, Grant Thornton did not obtain approval from Defendants' Headquarters. Typically, written approval of any money being transferred over $30,000 is required by Defendants' Headquarters. This requirement was and is outlined in WD Brazil's 6th Amendment of Articles of Incorporation, clause 8, paragraph 4, item III.

36. The alleged Mark Long promised to provide the appropriate documentation but never did.

37. Eventually, the requested money was sent to the third party.

38. On or about October 4, 2017, the alleged Mark Long made another urgent payment request.

39. On or about October 26, 2017, Defendants' Senior Director Graham Holmes contacted Plaintiff and alerted him that he, and others, had fallen victim to a phishing scam.

40. Defendants were defrauded approximately $2 million.

41. Immediately, Plaintiff provided all relevant e-mails and information to Defendants' Supervisor Graham Holmes and made himself available to answer any questions Defendants had.

42. At all times material, Plaintiff was fully transparent with Defendants relating to the phishing scam.

43. At all times material, Plaintiff provided to all relevant Defendants' executives and supervisors information Plaintiff had on the phishing scam.

44. After discovering the fraud, Defendants set up an investigation team led by their Director of Ethics and Compliance Andrea DeShazo.

45. At all times material Andrea DeShazo was also handling Plaintiff's whistleblower claim and SEC investigation.

46. On or about October 31, 2017, Plaintiff sent Graham Holmes an e-mail expressly stating Defendants needed to report this fraud to the Central Bank of Brazil and the Brazilian Police, as was required by Brazilian law, since the phishing scam was a financial crime.

47. Plaintiff's request to comply with Brazil law was completely and wholly ignored.

48. On or about October 31, 2017, Plaintiff sent an e-mail to Defendants' Board of Directors and other high-ranking officials, outlining what has occurred and imploring them to make the appropriate reports to Brazilian authorities. Thereafter, Graham Holmes contacted Plaintiff and told him he should have "never sent" that e-mail. Holmes further directed Plaintiff to only discuss the phishing scam with him.

49. Again, on or about November 7, 2017, Plaintiff demanded Defendants' investigative team notify the Brazilian authorities that a financial fraud occurred. No reasonable or immediate action was taken by Defendants to report the financial fraud to Brazilian authorities and to Citibank Brazil's Compliance Department, which was requesting the supporting documents for the payments.

50. Oddly, on or about November 8, 2017, three of Defendants' executives, C.B. Lim, David Vellema, Jan Sullin, abruptly resigned on the same day.

*Retaliation*

51. After interviewing Plaintiff relating to his whistleblowing activities, Defendants immediately cut Plaintiff off from all meetings he was previously a part of, while inviting all other similarly situated employees.

52. Additionally, Defendants' personnel, with whom Plaintiff had frequent contact with, suddenly and unexplainably distanced themselves from him.

53. Additionally, Defendants' Supervisor Graham Holmes immediately took away Plaintiff's key duties, such as, but not limited to, reviewing and facilitating payment requests, attending critical meetings with Grant Thornton, and giving Plaintiff no explanation on why his duties were being taken away.

54. Other similarly situated Defendants' employees have been victims of this and other phishing scams. Compared to those employees similarly situated, Plaintiff was treated harsher and had his duties stripped away from him immediately.

55. Defendants began to heavily scrutinize and question Plaintiff, while leaving other similarly situated employees alone.

56. After the phishing scam, Andrea DeShazo took away Plaintiff's work computer, providing no explanation as to why.

*Termination*

57. On or about November 30, 2017, Plaintiff, having been demoted by Defendants, stripped of his duties, treated like a criminal in the wake of a phishing scam, repeatedly lied to, and repeatedly ignored while imploring Defendants to abide by Brazilian law, was forced to contemplate resignation.

58. Plaintiff, wrote to Defendants' Supervisor Graham Holmes and stated "*I have improperly being treated as suspect for something that has extensively been probed that I was involved as an easy person to be blamed by others, so I was and still being victim of a sordid fraud scheme as such as WD, after a month of a very intensive investigation [sic]…*" Plaintiff went

onto state "*I have improperly [sic] being treated as suspect for something that has extensively been proven that I was involved as an easy person to blame by others..*"

59. On or about December 6, 2017, Plaintiff and Graham Holmes met to discuss Plaintiff's speculative resignation. Holmes encouraged Plaintiff to think over his decision to leave the company. Plaintiff agreed.

60. On or about December 13, 2017, Plaintiff spoke to Holmes. Plaintiff stated to Holmes he felt better after speaking to Holmes and decided to stay. Holmes immediately discouraged Plaintiff from staying, stating that Plaintiff's situation would not change, the investigation process would continue, and Plaintiff's former duties would never be reinstatement.

61. Then, on or about December 15, 2017, Defendants' Supervisor Holmes contacted Plaintiff, stating that Defendants had "no interest" keeping Plaintiff as an employee. Holmes then stated Defendants could offer Plaintiff a "Mutual Agreement." Thus, on December 15, 2017, Defendants actually terminated Plaintiff.

62. At all times material, Defendants terminated Plaintiff in retaliation for his speaking, both internally and externally, about perceived unlawful activity occurring.

63. On or about December 22, 2017, Defendants' Supervisor Holmes told Plaintiff that Defendants had "processed" his "resignation terms and pay." This, as Holmes knew, was not truthful—Plaintiff had been terminated and had not formally resigned.

64. The above are just some of the examples of the unlawful retaliation Defendants subjected Plaintiff.

65. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails and Plaintiff has also suffered future pecuniary

losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional distress

66. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, the Plaintiff demands Punitive Damages as against all the Defendants, jointly and severally.

## AS A FIRST CAUSE OF ACTION
## FOR WHISTLEBLOWER RETALIATION
### (In Violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010- 15 USC § 78u-6(h))

67. As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

68. At all times material hereto, Section 78u-6 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") was in effect and binding on Defendants. It permits individuals who allege discharge or other discrimination to bring an action in United States District Court for relief.

69. Dodd-Frank prohibits employers from discharging, demoting, suspending, threatening, harassing, directly or indirectly, or in any other manner discriminating against whistleblowers in the terms and conditions of employment because of any lawful act done by the whistleblower in providing information to the SEC, in initiating, testifying in, or assisting in any investigation or judicial or administrative act of the SEC based upon or related to such information, or in making disclosures that are required or protected under Dodd-Frank, and any other law, rule or regulation subject to the jurisdiction of the SEC.

70. Plaintiff is a whistleblower within the meaning of Dodd-Frank, as evidenced by his conduct described in the above paragraphs.

71. Defendants harassed, constructive discharged and retaliated against Plaintiff, and took other adverse actions against Plaintiff, including disclosing his entity as a whistleblower, after Plaintiff made oral and written complaints regarding what he reasonably believed to be illegal or unlawful conduct in violation of state and federal statutes, rules and regulations. Plaintiff made these complaints to his employer, by and through its agents and employees, as well as to the SEC and DOJ.

72. Plaintiff is informed and believes, and thereon alleges that because of his making complaints regarding Defendants' illegal conduct and/or conduct Plaintiff reasonably believed to be illegal, Plaintiff was constructively discharged from his employment and/or otherwise discriminated and retaliated against by Defendant after he had made the aforesaid disclosures and complaints about illegal conduct.

73. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer pain and mental anguish and emotional distress.

74. Plaintiff has further suffered and will continue to suffer a loss or earnings and other employment benefits, whereby Plaintiff is entitled to general compensatory damages in amounts to be proven at trial.

75. Defendants' actions constituted a willful violation of the above mentioned federal laws and regulations. As a direct result, Plaintiff has suffered and continues to suffer substantial losses related to the loss of wages and is entitled to recover costs and expenses and attorney's fees in seeking to compel Defendant to fully perform its obligations under state and federal law, in amounts according to proof at time of trial.

76. The conduct of Defendants described hereinabove was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff

77. As a proximate result of the actions and conduct described hereinabove, which constitute violations of Dodd-Frank, Plaintiff has been damaged in an amount according to proof at the time of trial, and seeks all relief allowable by law including without limitation double back pay, injunctive and declaratory relief, make-whole relief, civil penalties, litigation costs, expert witness fees and attorneys fees against Defendants pursuant to Dodd-Frank.

78. Wherefore Plaintiff prays for relief as stated in pertinent part hereinafter.

**AS A SECOND CAUSE OF ACTION**
**RETALIATION UNDER THE LABOR CODE**
**VIOLATION OF CAL. LAB. CODE § 98.6**

79. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

80. In violation of California Labor Code § 98.6, Defendants retaliated against Plaintiff for having opposed, resisted, and complained of the acts alleged herein.

81. After Plaintiff complained of Defendants violations of various state and federal laws and regulations, Plaintiff was ignored, mistreated, and retaliated against by Defendants' supervisors, treated with hostility, and then was constructively terminated.

82. The conduct of Defendants and/or their agents/employees as described herein was malicious, and/or oppressive, and done with a willful and conscious disregard for Plaintiff's rights and for the deleterious consequences of Defendants' actions. Defendants and/or their agents/employees or supervisors authorized, condoned and ratified the unlawful conduct of

the remaining Defendants.  Consequently, Plaintiff is entitled to punitive damages against Defendants.

### AS A THIRD CAUSE OF ACTION
### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

83. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

84. Plaintiff's wrongful termination from his employment with Defendants was based upon Defendants' violation of the Public Policy of the State of California as put forward in California Labor Code §§1102.5, 98.6, and other statutes and provisions.

85. As a proximate result of Defendants' wrongful acts, Plaintiff has suffered and continues to suffer monetary losses incurred, and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

86. Defendants, and each of them, did the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intent to injure Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiff's rights.  The acts complained of were known to, authorized and ratified by Defendants.  Plaintiff is therefore titled to recover punitive damages from Defendants, and each of them, in an amount according to proof at the time of trial.

### AS A FOURTH CAUSE OF ACTION
### UNDER CALIFORNIA WHISTLEBLOWER
### PROTECTION ACT [CA LABOR §1102.5 to 1105]

87. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

88. California Labor Law, Chapter 5, §1102.5 provides:

"(a) An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(c) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

(d) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for having exercised his or her rights under subdivision (a), (b), or (c) in any former employment."

89. Pursuant to §1104 "In all prosecutions under this chapter, the employer is responsible for the acts of his managers, officers, agents, and employees."

90. Defendants engaged in unlawful retaliatory employment practices prohibited by §1102.5, by terminating and otherwise retaliating against Plaintiff because Plaintiff was and is a *bona fide* whistleblower; Plaintiff objected to unlawful practices, as promulgated by Federal Law, SEC regulations, SEC Administrative Guidance, and industry standards; Plaintiff refused to participate in fraudulent, negligent, and inaccurate work-related-activities; Plaintiff made numerous internal complaints about perceived unlawful practices and actual unlawful practices.

91. Plaintiff hereby makes claims against Defendants under all applicable causes of action under §1102.5.

**PRAYER FOR RELIEF** Wherefore, Plaintiff prays for judgment against Defendants as follows:

1. For compensatory damages, including lost wages, medical benefits and other employment benefits, according to proof;

2. For double back pay with interest;

3. For mental and emotional distress damages according to proof;

4. For punitive damages on each cause of action for which they are awardable;

5. For all civil penalties awardable;

6. For an award of interest, including prejudgment interest, at the legal rate;

7. For an award of litigation costs and attorneys' fees as awardable on each cause of action pursuant to Dodd-Frank, CMIA, the private attorney general doctrine, as codified in California Civil Code Section 1021.5, and any other available bases;

8. For an injunction ordering Defendants to cease and desist its unlawful practices;

7. For costs of suit incurred;

9. For such other and further relief as the court deems just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues so triable.

Date:   July 15, 2020
        New York, New York

Respectfully Submitted,

**DEREK SMITH LAW GROUP, PLLC**

*/s/Ishan Dave*
Ishan Dave, Esq.
177 Park Avenue, Suite 200
San Jose, California, 95113

*/s/ Alexander G. Cabeceiras*
Alexander G. Cabeceiras, Esq.
One Penn Plaza, Suite 4905
New York, New York 10119